IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEDLINE INDUSTRIES, INC. an Illinois Corporation, Plaintiff, v. STRATEGIC COMMERCIAL SOLUTIONS, INC., *et al.*, Defendants. | Case No. 07 CV 2783  Judge Castillo  Magistrate Judge Mason |

## MEDLINE'S RESPONSE TO STRATEGIC COMMERCIAL SOLUTIONS' MOTION TO DISMISS

SCS was the linchpin of a fraudulent telemarketing operation. It listened to each recorded call, offered "customer service," arranged to charge customer accounts, and arranged to ship infringing products. In short, it did everything but make the telemarketing calls.

SCS and its associates cloaked their operation in a myriad of corporations and funds transfer mechanisms, either to avoid liability or detection. Even SCS's U.S. address for "customer service" was phony, and complaints ended up in a dead letter file in a mail drop in New York.

Under the "Medline Savings" telemarketing scheme, Defendants Abukhalid and Wong, identifying themselves as Medline Savings, called elderly people offering to sell them worthless "pharmaceutical discount packages" for $398 each. SCS communicated with Wong, and probably Abukhalid, every day. It heard recordings from every call, supposedly to "verify" that customers consented to have their bank accounts charged. It also received numerous calls from "Medline Savings" consumers complaining about Wong and Abukhalid. Through these recordings and customer complaints, SCS knew that Wong and Abukhalid berated or tricked elderly customers into consenting, yet there is no evidence that SCS ever rejected a single one of the verifications. Indeed, SCS, under the guise of offering "customer service," either lied to consumers seeking refunds or outright refused to refund the money, getting paid every time it approved a charge to a customer's account.

Later, SCS lied to Medline as well, claiming in its sworn discovery responses that it had "no direct involvement" in the operation, that it "had no knowledge of the information requested concerning any persons placing such telemarketing calls," and that "there is no relationship between SCS and the individuals or entities placing the 'Medline Savings' telemarketing calls."

After approving the $398 charge, SCS, using the name Medline Savings, caused payment processors to withdraw the money, including from accounts in Illinois, and caused fulfillment companies to ship infringing packages, again for an entity called "Medline Savings."

Consumers and state Attorneys General began calling the plaintiff, Medline Industries, Inc. to lodge complaints. Medline Industries is a large well-regarded seller of medical supplies. The injury to Medline Industries' reputation is obvious.

## Argument

### I. Standard

For the purposes of SCS's 12(b)(6) motion, the Court should accept the allegations in the Second Amended Complaint as true, and should draw all reasonable inferences in Medline's favor. *Christensen v. County of Boone, Illinois,* 483 F.3d 454, 457 (7th Cir. 2007). For the purposes of SCS's 12(b)(2) motion, the court should accept Medline's allegations as true unless controverted by defendant's affidavits, with any disputes in the evidence resolved in favor of jurisdiction. *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003).

SCS has submitted an affidavit in support of its motion, but that affidavit never disputes the jurisdictional allegations in Medline's complaint, namely that SCS directed payment processors to deduct funds from Illinois banks in connection with "Medline Savings," and that in connection with various non-"Medline Savings" operations, SCS has directed the deduction of funds from Illinois banks, directed the shipment of fulfillment products to Illinois consumers, and communicated on a regular basis with Illinois consumers.

### II. The Court Has Personal Jurisdiction Over SCS

#### A. General Jurisdiction

This Court has personal jurisdiction over SCS because SCS has continuous and systematic general business contacts with Illinois. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984). Under the concept of general jurisdiction, "a firm that does business in Illinois on a regular basis may be sued in an Illinois court even if the plaintiff's cause of action does not grow out of that business," provided that "the business done by the defendant in Illinois be intentional, substantial, and continuous rather than inadvertent, trivial, or sporadic,

that it continue up to the time of suit, and that it evidence a purpose on the part of the defendant to avail himself of the protection of the laws of Illinois." *Asset Allocation and Management Co. v. Western Employers Ins.*, 892 F.2d 566, 570 (7th Cir. 1989).

SCS's general contacts are systematic and intentional, and are undertaken on a regular basis and with knowledge that Illinois residents and banks were involved. It has provided customer service to Illinois residents in connection with various telemarketing schemes, and has directed the deduction of funds from banks throughout Illinois. Second Amended Complaint (hereinafter "Comp."), ¶ 40. Medline conclusively identified four such telemarketing operations, but its investigations indicate that there were many more—by their very nature, these investigations were bound to uncover only a fraction of SCS's activities, yet they still indicated that a high percentage of SCS's telemarketing operations involved Illinois consumers. See **Exhibit 1**. The verification recordings and other customer data make clear from the outset with whom SCS is dealing, and SCS has the final say as to which customers are charged and which are not. Comp. ¶ 35. Thus, every time SCS directs the removal of funds from an Illinois bank, directs the shipment of fulfillment packages to Illinois consumers, communicates with Illinois consumers, or provides refunds to Illinois consumers, it does so of its own volition, and with knowledge of the consumers' status as Illinois residents.[1] SCS has thus purposefully availed itself of the protection of the laws of the State of Illinois, and personal jurisdiction is proper here.

SCS does not deny that it has provided customer service to Illinois residents in connection with the "PC One," "Secure Source," "PharmacyCards.com," or "Priority Savings" operations, or any other telemarketing operations for that matter. Nor does it deny that it has directed, and continues to direct, payment processors to deduct funds from Illinois banks. Instead, it makes the conclusory argument that Medline has failed to present sufficient general contacts with Illinois.

As shown above, Medline has established general personal jurisdiction over SCS. However, to the extent that SCS argues to the contrary, it is SCS's own wrongdoing which has deprived Medline of additional jurisdictional facts. See Medline's pending Motion To Compel

---

[1] SCS's knowledge is further confirmed by the paperwork SCS and its payment processors submit to banks, which prominently displays the address of the customer and the banks with whom SCS is dealing. See Affidavits of Heidi Ponder and Vicki Peloquin attached as **Exhibit 2** and **Exhibit 3**.

Jurisdictional Discovery and Reply in support.[2] It is unjust for SCS to deprive Medline of jurisdictional facts and then try to use that lack of knowledge to form the basis of a motion to dismiss. Thus, to the extent the Court believes that general jurisdiction is lacking, Medline asks the Court to order SCS to produce the withheld jurisdictional discovery, and to allow Medline to file an additional brief before ruling. Alternatively, as a penalty for SCS's ongoing refusal to provide jurisdictional discovery, Medline asks the Court to rule that personal jurisdiction has been established over SCS, or at the very least to shift the burden of proof on jurisdiction from Medline to SCS. *See, e.g., Insurance Corp. of Ireland v. Compagnie Des Bauxites*, 456 U.S. 694, 707-09 (1982) (finding that the district court did not abuse its discretion in deeming personal jurisdiction established as a sanction for defendant's failure to comply with jurisdictional discovery); *Koehler v. Bank of Bermuda, Ltd.*, 2003 WL 289640, *12-13 (S.D.N.Y. Feb. 11, 2003) (ordering the jurisdictional burden of proof shifted as a sanction against defendant who contested personal jurisdiction but did not cooperate in jurisdictional discovery).

### B. Specific Jurisdiction under the Effects Doctrine

As a defendant who harmed an Illinois trademark owner and reached into the state in connection with its trademark infringement, SCS is subject to personal jurisdiction under the effects doctrine.

The Seventh Circuit adopted the effects doctrine, first recognized by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984), in *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club*, 34 F.3d 410 (7th Cir. 1994). In that case, the court held that jurisdiction over an out-of-state trademark infringer was proper in Indiana, even when the defendant had no contacts with Indiana, because the plaintiff was based there and was therefore injured there. *Id.* at 411-412. Thus, nder the effects doctrine, "specific jurisdiction can be proper when the injury occurs in Illinois, even if all of the other relevant conduct took place elsewhere." *Int'l Molding Mach. Co. v. St. Louis Conveyor Co.*, 2002 WL 1838130, *4 (N.D. Ill. Aug. 12, 2002).

The court in *Indianapolis Colts* noted that some sort of entry into the state is required. *Indianapolis Colts*, 34 F.3d at 412. In *Calder*, the defendant's "entry" was the subsequent sale

---

[2] How many Illinois consumers has SCS serviced? How long do these calls last? What sort of business is transacted during these calls? Does SCS ever send emails or letters to these Illinois consumers? Does it ever call them? How often does SCS give refunds to Illinois consumers? From how many Illinois banks has SCS ordered funds deducted, and what were the total amounts? These are all questions that have a direct bearing on general jurisdiction, but SCS simply won't answer them. By providing false discovery responses and then refusing to supplement them as required by Rule 26(e), SCS has denied Medline and the Court the full picture regarding its general contacts with Illinois.

by third parties of magazines containing a defamatory article, while in *Indianapolis Colts*, the defendant's "entry" was the subsequent broadcast by third parties of infringing football games. Other courts have similarly held that the threshold for entry under the effects doctrine is very low. *See, e.g., Ridell, Inc. v. Monica*, 2003 WL 21799935, *3 (N.D.Ill. July 25, 2003) (finding personal jurisdiction in trade secrets case where defendant mailed a single advertisement to an Illinois consumer); *Systems Designs, Inc. v. New Customware Co., Inc.*, 248 F.Supp.2d 1093, 1099-1102 (D.Utah 2003) (finding personal jurisdiction in trademark infringement case where plaintiff was based in Utah and defendant listed companies "with a large Utah presence" as clients on its web site, even though defendant "did not have deliberate or repeated contacts with Utah"); *U.S. Tsubaki, Inc. v. Indus. Research Team*, 2001 WL 99696, *3 (N.D.Ill. Feb. 1, 2001) (finding personal jurisdiction in Lanham Act case where plaintiff was based in Illinois and Canadian defendant distributed 4 copies of infringing report to Illinois consumers, out of a total of 2,275 copies distributed nationally); *Nida Corp. v. Nida*, 118 F.Supp.2d 1223, 1231 (M.D.Fla. 2000) (finding personal jurisdiction in trademark infringement case where California defendant derived $27,428 in revenue from Florida between 1995 and 2000, against the backdrop of $1,000,000 in nationwide revenue in 1999 alone); *Brown v. CitiCorp*, 1998 WL 341610, *5 (N.D.Ill. June 22, 1998) (finding personal jurisdiction in patent and copyright case where defendant did no business in Illinois but advertised its infringing services in Illinois); *Heroes, Inc. v. Heroes Foundation*, 958 F.Supp. 1, 3-5 (D.D.C. 1996) (finding personal jurisdiction in trademark infringement case where defendant placed a single infringing advertisement in a forum newspaper and operated a passive web site accessible to forum residents).

SCS has sufficient minimum contacts with Illinois to satisfy due process requirements under the effects doctrine. SCS selected consumers with Illinois bank accounts as proper "Medline Savings" customers, then directed payment processors to make deductions from these Illinois banks, with SCS deriving a financial benefit from each transaction.[3] Comp. ¶¶ 35-36. SCS knew that these were Illinois banks, as it reviewed the verification recordings containing this information

---

[3] Only SCS knows how many Illinois banks it targeted. Medline confirmed two and found a likely third, but those were merely the banks that happened to call SCS. See Exhibit 1, ¶ 7; Exhibit 2, ¶ 2; Exhibit 3, ¶ 2. The paperwork sent to the banks did not include SCS's phone number, but rather the payment processor's, so there were no doubt many more Illinois banks affected. See Exhibit 1, ¶ 8. Indeed, by sifting through just a sample of the 250 hours of "Medline Savings" verification recordings, Medline found a fourth Illinois bank targeted by the scheme, one that had never called SCS, indicating that there are likely dozens more. See Exhibit 1, ¶ 9. As part of the jurisdictional discovery authorized by this Court, Medline sought documents from SCS that would reveal every Illinois bank from which SCS ordered the withdrawal of "Medline Savings" funds, but SCS refused to comply. See Exhibit 1, ¶ 10.

and then instructed its payment processors accordingly. Comp. ¶¶ 35-36. This knowledge is confirmed by the paperwork submitted by SCS's payment processors, which prominently list the Illinois addresses of the banks. See Exhibit 2, ¶ 3; Exhibit 3, ¶ 3. Later, SCS fielded customer service calls from some of these Illinois banks regarding the "Medline Savings" charges. See Exhibit 1, ¶ 7. Even if these Illinois bank transactions were a small fraction of the total number of transactions ordered by SCS, personal jurisdiction is still proper under the effects doctrine, as these transactions were performed using the MEDLINE trademark, with knowledge of Medline's ownership of the MEDLINE trademark and the harm that would be felt to Medline in Illinois. Comp. ¶¶ 36, 46. These activities have indeed caused Medline and its reputation irreparable harm, with numerous consumers being confused into believing that the "Medline Savings" telemarketing operation was affiliated with or endorsed by Medline, and some consumers and law enforcement officials even contacting Medline to express such a belief. Comp. ¶ 49.

SCS does not dispute that it instructed payment processors to deduct "Medline Savings" funds from Illinois banks. Instead it suggests that it cannot be subject to personal jurisdiction because a third party carried out these activities. The Supreme Court expressly rejected this argument in *Calder*. In *Calder,* authors of a defamatory article argued that they could not control where their employer distributed a magazine, yet the court still held them subject to jurisdiction. *Calder*, 465 U.S. at 789. *Calder* attributed the subsequent foreseeable actions of their employer to the defendants, a far broader ruling than the situation faced here, where SCS exercised independent discretion and directed the payment processors to deduct funds.

Numerous other courts have also ruled that a defendant cannot escape the reach of the courts by using an intermediary to carry out its wrongdoing. *See, e.g., Finley v. River North Records, Inc.,* 148 F.3d 913, 916 (10th Cir. 1998) (finding personal jurisdiction over out-of-state defendant in fraudulent inducement case, even though defendant retained a booking agent to carry out the fraudulent activity); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 412 (7th Cir. 1994) (finding personal jurisdiction over out-of-state trademark infringer, even though third-party cable companies physically broadcast the football games that reached the forum state); *Brown v. SBC Communications, Inc.*, 2007 WL 684133, *3 (S.D.Ill. Mar. 1, 2007) (finding personal jurisdiction over out-of-state telecommunications service provider, even though it used intermediary "billing clearinghouses" to levy fraudulent telephone charges and it was "three steps removed from the customer"); *Morris v. Khadr*, 415 F.Supp.2d 1323, 1336 (D.Utah 2006) (finding personal jurisdiction over foreign terrorist, even though

defendant used a third party to carry out the attack that harmed the plaintiffs); *Worldtronics Intern., Inc. v. Ever Splendor Enterprise Co., Inc.,* 969 F. Supp. 1136, 1141 (N.D. Ill. 1997) (finding personal jurisdiction over foreign patent infringer, even though the infringer "ships the accused product f.o.b. outside of Illinois to a customer who ships the product to Illinois, albeit sometimes through yet another customer"); *Heroes, Inc. v. Heroes Foundation*, 958 F.Supp. 1, 3 (D.D.C. 1996) (finding personal jurisdiction over trademark infringer even though a third party placed the infringing advertisement in a forum newspaper); *Ragold, Inc. v. Ferrero, U.S. A., Inc.*, 506 F.Supp. 117, 120 (N.D.Ill. 1980) (finding personal jurisdiction over out-of-state defendant even though it used an independent advertising agency to distribute the false advertisements at issue in the case).

Under these circumstances, it was foreseeable that SCS would be required to answer for its actions in Illinois. Exercising personal jurisdiction over SCS will not offend traditional notions of fair play and substantial justice. Illinois has an interest in adjudicating this case because Medline is an Illinois company and SCS's activities caused injury in Illinois, and because SCS directed the fraudulent withdrawal of funds from Illinois banks. Moreover, SCS has not claimed that it would be unduly burdensome to litigate in Illinois, and it would not. *Board of Trustees v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000) ("easy air transportation, the rapid transmission of documents, and the abundance of law firms with nationwide practices, make it easy these days for cases to be litigated with little extra burden in any of the major metropolitan areas.").

### C. Specific Jurisdiction By Transaction Of Business And Commission Of A Tort

SCS is also subject to personal jurisdiction in Illinois because, by virtue of the "Medline Savings" bank transactions, it transacted business and committed tortious acts in this state.[4] Under the Illinois Long Arm Statute, a court sitting in Illinois may exercise specific jurisdiction over a defendant who engages in "the transaction of any business within this State" or "the commission of a tortious act within this State." 735 ILCS 5/2-209(a).

Fraud is a tort, as is trademark infringement. *See, e.g., Habitat Wallpaper and Blinds, Inc. v. K.T. Scott Ltd. Partnership,* 807 F.Supp. 470, 473 (N.D. Ill. 1992). "Illinois courts have held that the commission of a single tortious act in Illinois brings a defendant within the scope of § 2-

---

[4] As discussed above, neither the "transacts business" nor "tortious act" analysis is altered by the fact that SCS directed payment processors to carry out these activities, as the courts have held that a defendant cannot evade personal jurisdiction by using an intermediary to carry out its wrongdoing.

-7-

209(a)(2), even if the defendant has no other contact with Illinois." *Id.* at 473, n. 2. *See also Magnum Feeders, Inc. v. Bloedorn*, 1995 WL 743747 (N.D. Ill. Dec. 12, 1995) (finding personal jurisdiction over out-of-state trademark infringer whose only contacts with Illinois were the sale of $865 in infringing bird cages, or 0.0074% of defendant's total infringing sales). Moreover, submitting a request into Illinois to obtain payment for a fraudulent transaction is a tortious act under the Long Arm Statute. *See, e.g., Czarnowski Display Services, Inc. v. Bell*, 2004 WL 1613553, *3 (N.D.Ill. July 19, 2004). SCS facilitated telemarketing fraud and infringed the MEDLINE trademark by directing "Medline Savings" deductions from Illinois banks. Comp. ¶¶ 35-36. As such, even if these Illinois bank transactions were few in number, they nonetheless give rise to personal jurisdiction as tortious acts committed in Illinois.

A single transaction or solicitation in Illinois may be sufficient to confer personal jurisdiction, even if the defendant never physically entered Illinois, provided that the lawsuit arises out of that transaction. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *R.E. Davis Chemical Corp. v. International Crystal Lab., Inc.*, 2004 WL 2191328, *4 (N.D. Ill. Sep. 27, 2004); *Westnofa USA Inc. v. British Design (U.S.A.) Corp.*, 1983 WL 420, *2 (N.D. Ill. Nov. 8, 1983). By directing its payment processors to deduct funds from Illinois banks, SCS transacted business within Illinois, and Medline's complaint arises out of that business. This provides a separate basis for this Court to assert personal jurisdiction over SCS.

### D.     Jurisdiction Pursuant to Fed.R.Civ.P. 4(k)(2)

Should the Court conclude that Illinois lacks personal jurisdiction over SCS, jurisdiction would still be proper under Fed.R.Civ.P. 4(k)(2), which covers defendants "who do not reside in the United States, and have ample contacts with the nation as a whole, but whose contacts are so scattered among states that none of them would have jurisdiction." *ISI Int'l, Inc. v. Borden Ladner Gervais*, 256 F.3d 548, 551 (7th Cir. 2001).

Given the public policy concerns behind Rule 4(k)(2), the threshold for minimum contacts with the United States is low. *See, e.g., Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) (finding sufficient contacts with the United States as a whole where defendant insurance company paid claims to 155 U.S. companies from 1991 to 1994 and insured 260 shipments to the United States between 1989 and 1995); *Graduate Management Admission Council v. Raju*, 241 F.Supp.2d 589, 599-600 (E.D.Va. 2003) (finding jurisdiction proper under Rule 4(k)(2) based on foreign defendant's electronic contacts with the United States, even though defendant did not physically enter the country, noting that "to find otherwise

would not only frustrate [plaintiff's] attempts in this case to vindicate its rights under United States law, by requiring [plaintiff] to turn to foreign courts to vindicate those rights against a likely elusive defendant, it would also provide a blueprint whereby other individuals bent on violating United States trademark and copyright laws could do so without risking suit in a United States court.").

SCS has had sufficient contacts with the United States, both from a specific jurisdiction and general jurisdiction standpoint, to permit the application Rule 4(k)(2) in this case. SCS has provided customer service, directed the withdrawal of funds, and directed the shipment of fulfillment products to tens of thousands of U.S. banks and citizens, with Medline's claims arising out of many of those activities.[5]

SCS purposefully availed itself of the protection of the laws of the United States, and it could therefore reasonably anticipate being haled into a U.S. court. First, SCS derives a substantial economic benefit from its dealings with U.S. consumers and banks.[6] The more U.S. consumers that SCS approved, the more SCS was paid, with the funds being deducted from U.S. bank accounts and then wired directly to SCS from a U.S. bank. Comp. ¶¶ 35, 37. Second, by providing such extensive assistance to telemarketing schemes it knew or should have known to be fraudulent—and in some cases engaging in fraudulent activity itself—it was entirely foreseeable that SCS would harm citizens of the United States. *See, e.g., Mwani v. bin Laden,* 417 F.3d 1, 14 (D.C. Cir. 2005) (jurisdiction proper under Rule 4(k)(2) where defendants did not have sufficient minimum contacts with any one state, but could reasonably anticipate being haled into U.S. court by virtue of the harms they caused to U.S. citizens).

---

[5] Based on the Identacall verification recordings described in Medline's complaint, there were at least 5,000 "Medline Savings" customers, spread throughout the United States. SCS claims that the "Medline Savings" operation lasted for less than a year, and that SCS has provided customer support for dozens of other telemarketing operations over the past several years. Thus, it is a conservative estimate that SCS has had business contacts with tens of thousands of U.S. customers and their banks.

[6] SCS was paid over $80,000 for the "Medline Savings" operation alone. See Exhibit 1, ¶ 11. Again, taking at face value SCS's claims that "Medline Savings" was a small part of its dozens of overall telemarketing operations, that means SCS has derived substantial revenue, likely millions of dollars, from its dealings with U.S. consumers and banks.

To avoid the daunting situation where a plaintiff has to "traipse through the 50 states, asking whether each could entertain the suit," the Seventh Circuit provides the following solution:

> A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable). If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).

*ISI Int'l*, 256 F.3d at 552. Thus, in accordance with Rule 4(k)(2) and the decision in *ISI Int'l*, Medline calls upon SCS to state in its reply brief the states in which it believes this lawsuit can proceed. Should SCS fail to do so, then in accordance with Seventh Circuit precedent, Medline asks this Court to maintain jurisdiction over SCS pursuant to Rule 4(k)(2).

### III. Medline Has Stated Valid Claims For Trademark Infringement And Telemarketing And Consumer Fraud

#### A. Telemarketing and Consumer Fraud claims

The "Medline Savings" telemarketers misrepresented the actual cost of the "Medline Savings" package, fraudulently claimed to be calling from consumers' banks in order to obtain their bank account information, caused consumers' bank accounts to be debited without their actual authorization, and failed to establish proper mechanisms by which consumers could obtain a refund. Comp. ¶¶ 28, 31-33, 51. These acts constituted deceptive and abusive telemarketing practices. *See* 15 U.S.C. § 6102(a)(1); 16 C.F.R. §§ 310.3 and 310.4.

SCS assisted and facilitated the "Medline Savings" telemarketing fraud. Comp. ¶¶ 34-44, 52. As a result, SCS is liable under the Telemarketing Fraud Act as well. *See* 15 U.S.C. § 6102(a)(2) ("The Commission shall include in such rules respecting deceptive telemarketing acts or practices a definition of deceptive telemarketing acts or practices . . . which may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing"); 16 C.F.R. § 310.3(b) ("It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in" deceptive or abusive telemarketing); *F.T.C. v. Leisure Time Marketing, Inc.*, 2001 WL 34133935, *2 (M.D.Fla. June 18, 2001) (defining "substantial assistance and support" as including "performing

-10-

customer service functions for an entity engaged in telemarketing including, but not limited to, receiving or responding to consumer complaints").[7]

These deceptive and abusive telemarketing practices irreparably harmed Medline because consumers and law enforcement officials believed Medline was the entity responsible for them, and Medline therefore suffered damages to its business and reputation well in excess of $50,000. Comp. ¶¶ 49, 54. Thus, Medline has been "adversely affected by" a "pattern or practice" of deceptive and abusive telemarketing, and therefore has standing to bring suit under the Telemarketing Fraud Act. 15 U.S.C. § 6104(a).

SCS argues that this harm is not enough to give Medline standing, because Medline is seeking "statutory damages under the Lanham Act" rather than actual damages. However, Medline is not seeking statutory damages under the Lanham Act, as that statute does not even provide for statutory damages for the claims Medline is asserting. Rather, as shown in its prayer for relief, Medline is seeking "an award for damages due to the injury to its business reputation and the loss of its goodwill by reason of Defendants' engagement in or substantial assistance to deceptive and abusive telemarketing practices, and by Defendants' offer to sell and sales of goods and services not emanating from Medline but identified with Medline's MEDLINE trademark." Comp., p. 20. *See also* 15 U.S.C. § 1117(a) (trademark infringer subject to an award of "any damages sustained by the plaintiff").[8]

---

[7] SCS argues, without citation to any authority, that SCS cannot be liable for assisting the telemarketing fraud because it did not monitor the instrumentality of the fraud. There is no basis for such a requirement in the statute or case law, but regardless, Medline has pleaded facts showing that SCS *did* monitor the instrumentality of the telemarketing fraud. Second Amended Complaint, ¶¶ 34-44, 61.

[8] SCS cites cases supporting dismissal where a plaintiff made speculative claims for damages, but none of those decisions is on point. In *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 860 (7th Cir. 1999), plaintiff accused defendant of conspiring in an unlawful search, but failed to plead any facts regarding when the conspiracy was formed or what its terms were. Similarly, in *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1988), plaintiff accused defendant judge of conspiring with litigants to deny his earlier claim, but failed to plead any facts regarding the nature of the conspiracy. In *Piscotta v. Old Nat'l Bancorp*, 499 F.3d 629, 632 (7th Cir. 2007), plaintiffs accused defendant bank of failing to protect their personal data, but never alleged that defendant's failure led to any identity theft or loss of money from their accounts. In *Dunkin Donuts Inc. v. N.A.S.T., Inc.*, 428 F.Supp.2d 761 (N.D.Ill. 2005), the court found that defendant failed to submit enough evidence to support its counterclaim for damages, but that decision was on *summary judgment*, not a motion to dismiss, and the defendant had failed to produce any evidence of damages in discovery. Finally, as summarized by Justice Stevens, *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) had nothing to do with damages, but rather with a failure to plead liability in the first place: "The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws. *Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws.* Rather, the theory on which the Court permits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all." *Id.* at 1984 (emphasis added).

-11-

SCS notes that the Senate originally limited the "adversely affected" language to purchasers, financial institutions, and credit card companies. But SCS fails to mention that the House had no such limitation. *See* H. Rep. No. 103-20, 1993 WL 54276, *10 ("Subsection (a) permits injured persons, including individuals, partnerships, and corporations, to bring civil actions to enforce the rules promulgated under the bill."). The Senate and the House each passed their own respective versions of the bill, but on July 25, 1994, the House asked the Senate to accept the broader language, and on August 2, 1994, the Senate did so. See **Exhibit 4**. Thus, while the Senate originally contemplated the narrow standing language noted by SCS, it accepted the House's broader version, which means that an aggrieved trademark holder like Medline does have standing to file suit under the Telemarketing Fraud Act. *See, e.g., 800-JR Cigar, Inc. v. GoTo.Com*, 437 F.Supp.2d 273, 296 (D.N.J. 2006) ("[T]he Act states that those persons who are 'adversely affected' are authorized to bring a civil action against a deceptive telemarketer. First, GoTo argues that it is the public, not JR Cigar itself, that has been allegedly deceived by GoTo's actions and that JR Cigar therefore lacks standing to bring a claim. This argument is without merit. JR Cigar is most certainly aggrieved by practices (if proven) that take unfair advantage of its marks and divert customers away from its website.").

## B. Trademark claims

Medline has stated a valid claim for SCS's direct trademark infringement. Section 32 of the Lanham Act makes actionable a defendant's "use in commerce" of the plaintiff's mark "in connection with the sale, offering for sale, distribution or advertising of any goods or services."[9] 15 U.S.C. § 1114(1). Courts have construed "use in commerce" broadly in the context of infringement and unfair competition claims. *See, e.g., United We Stand America, Inc. v. United We Stand, America*, 128 F.3d 86, 90-93 (2nd Cir. 1997) (defendant's use of mark as a source identifier while soliciting funds qualified as "use in commerce," even though defendant never sold any goods or services in connection with the mark); *Council of Better Business Bureaus, Inc. v. Bailey & Assoc., Inc.*, 197 F.Supp.2d 1197, 1212 (E.D.Mo. 2002) (defendant's distribution of documents bearing the BBB mark constituted "use in commerce," even though defendant did not use the mark with its own goods or services, and often used the mark "after a sale, presumably to

---

[9] This is broader than the definition cited by SCS, which actually applies to registrability and not infringement. *See McCarthy on Trademark and Unfair Competition*, J. Thomas McCarthy, § 23:11.50 (4th Ed. 2008) ("If one were to substitute the Lanham Act § 45 definition of 'use in commerce' into the § 32(1) infringement requirement, the result would be awkward and inept. It would be a robotic statutory reading divorced from the meaning and history of what trademark 'use' signifies for acquiring rights as opposed to infringing someone else's trademark rights.").

make the customer comfortable with the purchase."); *Jews For Jesus v. Brodsky*, 993 F.Supp. 282, 309 (D.N.J. 1998) ("The requirement that the activities of an infringer be done 'in connection with any goods or services,' does not require the infringer to actually cause goods or services to be placed into the stream of commerce. Rather, all that is needed is that the trademark violation be 'in connection' with any goods or services.").

SCS's actions fall well within the language of 15 U.S.C. § 1114(1). After deciding which customers to include in the "Medline Savings" program, SCS directed payment processors to deduct funds from consumers' bank accounts under the "Medline Savings" name and directed fulfillment companies to ship "Medline Savings" packages to consumers. Comp. ¶¶ 34-36, 38, 42-43. The deduction of funds and the shipment of goods all prominently featured the MEDLINE trademark.[10] Comp. ¶¶ 36, 38, 41. As a result of SCS's actions, consumers are likely to be confused as to the source of origin of the "Medline Savings" goods and services; in fact, consumers have already been confused. Comp. ¶¶ 49, 56.

SCS argues that Medline failed to explicitly allege that these activities constituted use in commerce. This argument is without merit. Medline's allegations refer to SCS's "use" of the trademarks, and deducting funds and shipping products are "in commerce." SCS offers no case law to support the notion that under the liberal notice pleading provisions of Rule 8(a), a plaintiff must explicitly recite the words "use in commerce" in order to state a valid claim. *See Council of Better Business Bureaus*, 197 F.Supp.2d at 1213 (rejecting the same argument as "merely a matter of semantics"). The one case cited by SCS, *Rescuecom Corp. v. Google, Inc.*, 456 F.Supp.2d 393 (N.D.N.Y. 2006), merely held that Google's sale of keywords in connection with its search engine results did not constitute use of the mark in commerce, because this was an internal use within Google's software and not visible to the public. In sharp contrast, consumers in the instant case did encounter the MEDLINE trademark in connection with Defendants' goods and services, which explains why many were actually confused.

Medline has also stated a valid claim for SCS's contributory trademark infringement. Contributory trademark infringement occurs where "a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Laboratories, Inc.*

---

[10] The Lanham Act broadly defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1117. Wire transfers and shipments of goods qualify under this definition, as Congress has passed laws regulating both.

*v. Ives Laboratories Inc.*, 456 U.S. 844, 854 (1982). The courts have recognized that contributory trademark infringement is a valid claim in the context of both goods and services. *See, e.g., Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992) (holding that contributory trademark infringement applies to services as well as goods, and noting that a flea market operator would be liable for contributory trademark infringement if it knew of or was willfully blind to a vendor's direct infringement). In the context of services, some courts have gone so far as to require a plaintiff to plead that a defendant directly controlled and monitored the instrumentality of infringement used by the direct infringer. *See, e.g., Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999). The Seventh Circuit has not adopted the *Lockheed Martin* "control and monitoring" standard.

Courts have consistently permitted contributory trademark infringement claims to go forward in the context of services.. *See, e.g., Adidas America, Inc. v. Kmart Corp.*, 2007 WL 2915594, *9 (D.Or. Oct. 3, 2007) (denying the defendant's motion for summary judgment on contributory trademark infringement where the defendant "provides the space for the allegedly infringing activities, processes the sales of the allegedly infringing products, and receives a portion of the gross revenue from those sales"); *Habeeba's Dance of the Arts, Ltd. v. Knoblauch*, 430 F.Supp.2d 709, 715 (S.D.Ohio 2006) (holding that the plaintiff stated a valid claim for contributory trademark infringement against the YWCA for hosting a dance symposium, which the YWCA knew or should have known was being presented using an infringing trademark, and noting that liability would ultimately turn on "how substantially involved" the YWCA was in the business operations of the direct infringer); *Gucci America, Inc. v. Hall & Associates*, 135 F.Supp.2d 409 (S.D.N.Y. 2001) (holding that the plaintiff stated a valid claim for contributory trademark infringement against an ISP that provided web-related services to a customer which the ISP knew or should have known was posting infringing content); *Century 21 Real Estate Corp. v. R.M. Post, Inc.*, 8 U.S.P.Q.2d 1614 (N.D.Ill. 1988) (holding that the plaintiff stated a valid claim for contributory trademark infringement against a phone book publisher who knew or should have known that it had printed an infringing advertisement).

SCS's actions satisfy these requirements for contributory trademark infringement. SCS directed the payment processors to deduct "Medline Savings" funds from bank accounts and directed the fulfillment companies to ship out "Medline Savings" packages. Comp. ¶¶ 35-36, 38. Moreover, SCS supplied numerous services to the "Medline Savings" infringers. Comp. ¶¶ 34-

43. SCS continued these actions even though it knew or should have known of the "Medline Savings" infringements. Comp. ¶¶ 44, 61. SCS directly controlled and monitored the instrumentality of these infringements. Comp. ¶¶ 44, 61. Specifically, SCS listened to sales recordings and decided which consumers to approve and which consumers to reject, directed the deduction of funds from consumers' bank accounts, directed the shipment of infringing packages, and worked to block consumers from cancelling the transactions. Comp. ¶ 35-36, 38, 42-43. In that the MEDLINE trademark was used in connection with these activities, Medline has supported its allegation that SCS directly controlled and monitored the infringers' instrumentality of infringement. Thus, Medline has stated a valid claim that SCS committed contributory trademark infringement by (1) inducing the payment processors and fulfillment company to infringe the MEDLINE trademark, and (2) continuing to supply its services to the "Medline Savings" telemarketers even though it knew or should have known of their infringements.[11]

## Conclusion

For the foregoing reasons, Medline respectfully requests that the Court deny SCS's motion to dismiss.

Respectfully submitted,

PATTISHALL, McAULIFFE, NEWBURY,
HILLIARD & GERALDSON LLP

Dated: March 6, 2008

By: /s/ Jared Solovay
Janet A. Marvel
Jared D. Solovay
311 South Wacker Drive, Suite 5000
Chicago, Illinois 60606
(312) 554-8000

*Attorneys for Plaintiff Medline Industries, Inc.*

---

[11] To the extent that it is inconsistent for Medline to allege that SCS's directions to the payment processors and fulfillment companies constituted both contributory and direct infringement, such inconsistent allegations are permissible at the pleadings stage. *See* Fed.R.Civ.P. 8(d)(2); *Limousine Werks, Inc. v. Flaherty Mfg., Inc.*, 1989 WL 8553, *4 (N.D.Ill. Jan. 31, 1989) ("a pleader may set forth inconsistent legal theories in his pleading and will not be forced to select a single theory on which to seek recovery.").

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a true and correct copy of the foregoing Medline's Response To Strategic Commercial Solutions' Motion To Dismiss to be sent by first-class United States mail this 6th day of March, 2008, to the following:

      John T. Shapiro, Esq.
      David L. Ter Molen, Esq.
      Freeborn & Peters, LLP
      311 South Wacker, Drive, Suite 3000
      Chicago, IL 60606

      Forrest L. Ingram, Esq.
      Forrest L. Ingram, P.C.
      79 West Monroe, Suite 900
      Chicago, IL 60603

*/s/ Jared Solvay*