UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 2783 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| STRATEGIC COMMERCIAL SOLUTIONS, | ) | |
| INC.; CAPITAL PAYMENT SYSTEMS, LLC; | ) | |
| WORLD WIDE MERCHANTS, LLC; PRIME | ) | |
| TIME SOLUTIONS, INC.; 9120-3140 QUEBEC | ) | |
| INC.; GROUPE CLADDAGH INC.; 9133-9069 | ) | |
| QUEBEC INC.; 9154-4619 QUEBEC, INC.; | ) | |
| THOMAS WONG; MOHAMMED | ) | |
| ABUKHALID; | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a novel case where an alleged victim of trademark infringement has sued multiple parties who were allegedly party to a telemarketing scheme in which the victim's trademark was used. At issue are two motions to dismiss the Second Amended Complaint ("SAC") of Plaintiff, Medline Industries, Inc. ("Medline"). Defendant Strategic Commercial Solutions ("SCS") filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), for lack of personal jurisdiction over SCS, and pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim against SCS upon which relief can be granted. (R. 33, SCS Mot. to Dismiss.) In addition, Defendants Thomas Wong and 9121-3140 Quebec Inc. (collectively, the "Wong Defendants") filed a motion to dismiss the SAC pursuant to Rule 12(b)(2) for lack of personal jurisdiction. (R. 41, Wong Mot. to Dismiss.)

## BACKGROUND[1]

### I.    Factual History

Medline is a manufacturer and distributer of medical products, with annual sales of over $3 billion. (R. 31, SAC ¶ 16.) Medline has used the trademark MEDLINE in connection with its medical products since at least 1968, and owns federal trademark registrations for this mark. (*Id.* ¶¶ 17-19.)

Medline alleges that sometime in 2006, Defendants Wong and Mohammed Abukhalid ("Abukhalid") began telephoning consumers under the name "Medline Savings" and fraudulently pressuring them into purchasing "pharmaceutical discount packages" for $398. (*Id.* ¶¶ 24-33.) Wong and Abukhalid are residents of Quebec, Montreal. (*Id.* ¶¶ 10, 12.) In connection with the "Medline Savings" operations, Medline alleges that Wong and Abukhalid entered into contracts under the names Benashore Marketing Group, Inc. ("Benashore") and Media Alliance Marketing, Inc. ("Media Alliance"). (*Id.* ¶ 25.) These entities were allegedly dummy corporations with no officers, assets, or valid addresses. (*Id.* ¶¶ 25-28.) Wong and Abukhalid allegedly worked with Defendant 9154-4619 Quebec, Inc. d/b/a Identacall, Inc. ("Identacall") to record the end of the "Medline Savings" calls to consumers, at which point the consumers appeared to authorize the $398 transactions. (*Id.* ¶¶ 30-31.) Medline alleges that the consumers' consents to the transactions were coerced. (*Id.* ¶¶ 30-33.)

---

[1] Most of the facts are derived from Medline's SAC, as on a motion to dismiss, the Court assumes all well-pleaded allegations in the complaint to be true and draws all reasonable inferences in the plaintiff's favor. Fed. R. Civ. P. 12(b)(6); *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 457 (7th Cir. 2007). In addition, on a motion to dismiss for lack of personal jurisdiction, the Court may also consider affidavits submitted by the defendant. *Nelson v. Bulso*, 149 F.3d 701, 703 (7th Cir. 1998).

In July 2006, SCS was engaged by Benashore to provide customer service for "Medline Savings" consumers. (R. 26, Mot. to Compel, Ex. 3, SCS Resps. to Pl.'s Interrogs. at No. 5.) Neil Haboush ("Haboush") is the president and owner of SCS, a Canada corporation with its offices and employees in Quebec. (R. 34, SCS Mot. to Dismiss, Ex. A Haboush Decl. ¶¶ 1, 5.) SCS does not have offices or employees located within the United States. (*Id.*) As part of the service SCS provided to Benashore, SCS allegedly listened to the recording of the consumers' conversations with Wong or Abukhalid to verify their consent to purchase the "pharmaceutical discount package." (R. 31, SAC ¶¶ 34-35.) If SCS concluded that the consent was informed, it would allegedly instruct Defendants Capital Payment Systems or World Wide Merchants to debit the consumers' bank accounts from numerous banks throughout the United States, including Illinois. (*Id.* ¶¶ 35, 40.) The electronic deductions were performed under the name "Medline Savings." (*Id.* ¶ 36.) Defendant Prime Time Solutions then fulfilled the consumers' orders by sending them their "pharmaceutical discount package," which consisted of promotional materials bearing the name "Medline" or "Medline Savings." (*Id.* ¶ 38.)

"Medline Savings" consumers were given a toll-free number to contact which was owned and operated by SCS. (R. 31, SAC ¶ 39.) Calls to the number reached a call center operated by SCS. (*Id.* ¶ 41.) SCS would ask callers to identify which toll-free number they had dialed, and when the callers identified the number (866) 395-2013, SCS would state that the caller had transacted business with "Medline Savings." (*Id.*) SCS would allegedly use the callers' telephone number to access their electronic records, including the verification recording related to the transaction. (*Id.*) Medline alleges that when customers would call to complain that Wong and Abukhalid had tricked them into authorizing the $398 transaction, SCS would try to

3

persuade the callers not to reverse the $398 charge. (*Id.* ¶¶ 42-43.) Some of the calls placed to the call center came from Illinois banks and residents. (*Id.* ¶ 39.)

SCS also owns and operates other toll-free numbers for different telemarketing operations, including PC One, Secure Source, PharmacyCards.com, and Priority Savings. (*Id.* ¶ 40.) SCS also provided customer service and verification services for its other telemarketing operations, including instructing payment processors to deduct funds from banks and directing customer orders be fulfilled. (*Id.*)

## II.    Procedural History

Medline initiated this lawsuit on May 17, 2007, against SCS and Capital Payment Systems, LLC, alleging violations of the Lanham Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"); the Illinois Uniform Deceptive Trade Practices Act; the Illinois Consumer Fraud and Deceptive Business Practices Act; and Illinois common law. (R. 1, Original Compl.) On June 6, 2007, this Court dismissed the original complaint *sua sponte*, "for failure to establish jurisdiction and venue over the two non-resident defendants," and authorized Medline "to proceed with expedited discovery and either file a proposed amended complaint in this district or the appropriate district with personal jurisdiction and venue over the defendants." (R. 9, 6/6/07 Min. Order.)

Medline subsequently filed an amended complaint in this Court on October 17, 2007, adding the Wong Defendants, Abukhalid, Party World Wide Merchants, LLC, Prime Time Solutions, Inc., Groupe Claddagh Inc., 9133-9069 Quebec Inc., and 9154-4619 Quebec Inc. (R. 11, Am. Compl.) Although the Court expressed that it "still is left with serious questions about jurisdiction and venue," we allowed Medline's attorneys to complete expedited service of the

4

amended complaint. (R. 12, 10/19/07 Min. Order.) On January 4, 2008, SCS filed a motion to dismiss the amended complaint under Rules 12(b)(2) and 12(b)(6) (R. 24), and on January 7, Medline filed a motion to compel jurisdictional discovery (R. 26), and a motion for leave to file the SAC (R. 27). The Court granted Medline's motion for leave to file the SAC and denied as moot SCS's motion to dismiss the first amended complaint. (R. 30, 1/10/08 Min. Order.)

In the SAC, Plaintiff alleges that: (1) Wong, Abukhalid, SCS, Capital Payment Systems, and World Wide Merchants violated the Telemarketing Act, 15 U.S.C. §§ 6102(a)(2) and 6104(a); (2) Wong, Abukhalid, SCS, Capital Payment Systems, World Wide Merchants, and Prime Time Solutions committed direct trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, *et seq.*, and common law; (3) SCS, Capital Payment Systems, World Wide Merchants, Prime Time Solutions, Identacall, and Groupe Claddagh committed contributory trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, *et seq.*, and common law; (4) Wong, Abukhalid, SCS, Capital Payment Systems, World Wide Merchants, and Prime Time Solutions use of Medline's trademark constitutes unfair competition, false representation, and false designation of origin in connection with Defendants' goods and services, in violation of 15 U.S.C. § 1125(a) and common law; (5) Wong, Abukhalid, SCS, Capital Payment Systems, World Wide Merchants, and Prime Time Solutions have caused and will cause dilution of Medline's trademark in violation of 15 U.S.C. § 1125(c)(1); and (6) Wong, Abukhalid, SCS, Capital Payment Systems, World Wide Merchants, and Prime Time Solutions violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* and the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (R. 31, SAC.) Medline alleges that numerous consumers have been confused into believing that Medline was affiliated with or

5

endorsed "Medline Savings." (*Id.* ¶ 49.)

SCS subsequently filed a motion to dismiss the the SAC for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6). (R. 33, SCS's Mot. to Dismiss.) The Wong Defendants also filed a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2). (R. 41, Wong Defs.' Mot. to Dismiss.)

On April 2, 2008, the Court granted in part Medline's motion to compel jurisdictional discovery from SCS. (R. 52, 4/2/08 Min. Order.) In addition, the Court directed "SCS to detail the nature and extent of SCS's contacts with the United States, including the nature of the contacts—whether providing customer service or another kind of service—and a description of the number and nature of telephone calls or emails, if any, that SCS or its employees made to individuals residing in the United States," in response to SCS's representation in its briefs in support of its motion to dismiss that "SCS's contacts with the United States are hardly more than its contacts with the State of Illinois." (*Id.*) Subsequently, SCS has reiterated their position that it is not subject to personal jurisdiction anywhere within the United States. (R. 55, SCS's Supp'l Resps. to Pl.'s Juris'l Discovery.)

The Court also requested the Wong Defendants to identify a federal district court, if any, where suit against them would be permissible. (R. 51, 4/1/08 Min. Order.) The Wong Defendants responded that the federal district court of New Hampshire would have personal jurisdiction over them based on their contacts with that state. (R. 53, Wong Defs.' Resp.)

In light of the supplemental filings by SCS and the Wong Defendants, the Court is now prepared to rule on both parties' motions to dismiss.

6

## ANALYSIS

### I.    Personal Jurisdiction

#### A.    Legal Standards

To establish personal jurisdiction when, as here, subject matter jurisdiction is predicated on the existence of a federal question, the plaintiff must establish that bringing the defendants into federal court in Chicago accords with due process principles and that the defendants are amenable to process in this Court. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999); *see also Olson v. Jenkens & Gilchrist*, 461 F. Supp. 2d 710, 721 (N.D. Ill. 2006) (citing *United States v. De Ortiz*, 910 F.2d 376, 381-82 (7th Cir. 1990)) In federal question cases, due process requires only that each party have sufficient contacts with the United States as a whole rather than any particular state or geographic area. *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001). The due process clause protects persons from being haled into a court unless they have "minimum contacts" with the sovereign that established that court, which in federal district court is the United States. *Id.*

A complaint need not include facts alleging personal jurisdiction; however, once a defendant moves to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating a *prima facie* showing of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781-82 (7th Cir. 2003); *Homer v. Jones-Bey*, 415 F.3d 748, 754 (7th Cir. 2005). A plaintiff is "entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record," and the Court will "read the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d

7

870, 877-78 (7th Cir. 2006).

Federal Rule of Civil Procedure 4(k) governs whether a defendant is amenable to service in federal court. Rule 4(k)(1) provides that service is effective to establish jurisdiction over the person of a defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located," or "when authorized by a statute of the United States." Fed. R. Civ. P. 4(k)(1)(A), (D). In addition, Rule 4(k)(2) provides that "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

## B.     The Wong Defendants

As explained above, the Wong Defendants assert that they are subject to jurisdiction in New Hampshire, so Rule 4(k)(2) does not apply to them. Medline asserts, however, that this Court has personal jurisdiction over the Wong Defendants pursuant to the doctrine of specific jurisdiction. The inquiry into specific jurisdiction asks whether it is "fundamentally fair" to require the defendant to submit to the jurisdiction of this Court with respect to this litigation. *Purdue*, 338 F.3d at 780. This test is met if the Wong Defendants—through their own, purposeful activity availing themselves of the privilege of conducting activities in Illinois—could have anticipated being haled into an Illinois court with respect to the claims at issue. *Id.* Because "a substantial amount of business is transacted solely by mail and wire communications across state lines," territorial presence in the forum state is not required. *Id.* at 781.

In the absence of a federal statutory provision for service, as in this case, Rule 4(k)(1)(A)

8

and Rule 4(e)(1) limit personal jurisdiction to the forum state's long-arm statute. *Olson*, 461 F. Supp. 2d at 722. The Illinois long-arm statute contains a "catch-all" provision that "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714-15 (7th Cir. 2002) (citing 735 Ill. Comp. Stat. 5/2-209(c)). The Seventh Circuit has found no "operative difference" between the Illinois and federal limits on personal jurisdiction. *Id.* at 715.

Medline asserts that the Wong Defendants debited Illinois bank accounts from "Medline Savings" consumers located outside of Illinois and that several of these Illinois banks contacted the "Medline Savings" customer service numbers run by SCS. (R. 47, Pl.'s Resp. to Wong Mot. to Dismiss, Ex. 1, Solovay Aff., Exs. A-C.) Based on these activities, Medline asserts that the Wong Defendants are subject to personal jurisdiction in Illinois under the "effects doctrine" and because they transacted business and committed tortious acts in Illinois. Courts in this district have applied the so-called "effects doctrine" where a defendant has aimed intentional tortious actions at a plaintiff residing in the forum state with the knowledge that the plaintiff will suffer harm in the forum state. *See, e.g., Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir. 1994); *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 835 (N.D. Ill. 2000) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). To find personal jurisdiction under the effects doctrine, the defendant must have "entered the state in some fashion," such as selling or broadcasting materials in the forum state. *Indianapolis Colts*, 34 F.3d at 412.

The Court agrees with the Wong Defendants that they did not enter or aim their allegedly tortious activities at Illinois by submitting payment requests to Illinois banks and fielding

9

customer service calls from Illinois banks. The cases cited by Medline involve at least some purposeful entry into Illinois, through direct advertisement or mailings. *See, e.g., U.S. Tsubaki, Inc. v. Indus. Research Team*, No. 00-4447, 2001 WL 99696, at *3 (N.D. Ill. Feb. 1, 2001) (finding personal jurisdiction in Lanham Act case where defendant published an allegedly false and misleading report in Illinois); *Brown v. CitiCorp.*, No. 97-6337, 1998 WL 341610, at *5 (N.D. Ill. June 22, 1998) (finding personal jurisdiction in patent and copyright case where defendant advertised its infringing services in Illinois.) In fact, Medline admits that the Wong Defendants did not direct any of their allegedly fraudulent and infringing telephone calls at Illinois consumers, as Illinois is a "no-call" state. While Medline properly alleges that it suffered harm in Illinois, the Wong Defendants did not sufficiently enter or aim their activities in Illinois to be subject to suit here.

Likewise, the Wong Defendants did not transact business or commit tortious acts in Illinois. Under the Illinois Long Arm Statute, a court sitting in Illinois may exercise specific jurisdiction over a defendant who transacts business or commits a tort in Illinois. 735 ILCS 5/2-209(a). Medline argues that the Wong Defendants committed a tort in Illinois because their actions harmed an Illinois trademark owner. However, "Illinois does not acquire jurisdiction merely by the fact that plaintiff felt harm here." *Berthold Types Ltd. v. European Mikrograf Corp.*, 102 F. Supp. 2d 928, 932 (N.D. Ill. 2000). For purposes of the Illinois Long Arm Statute, it is not enough that the trademark owner's domicile is in Illinois. *Id.* (citing *Lifeway Foods, Inc. v. Fresh Made, Inc.*, 940 F. Supp. 1316, 1319 (N.D. Ill. 1996)); *see also GMAC Real Estate, LLC v. E.L. Cutler & Associates, Inc.*, 472 F. Supp. 2d 960, 966 (N.D. Ill. 2006) (tortious act is not committed in Illinois merely because defendant allegedly caused plaintiff economic injury in

10

Illinois). Nor does withdrawing money from a few Illinois banks accounts (whose owners reside

outside Illinois) constitute transacting business within Illinois. "A corporation is doing business

if it operates within the state, not occasionally or casually, but with a fair measure of permanence

and continuity." *Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 724

(7th Cir. 1994) (internal citations omitted). The Wong Defendants' contacts with Illinois were

too attenuated to establish minimum contacts. Accordingly, the Wong Defendants' motion to

dismiss Medline's SAC under Rule 12(b)(2) for lack of personal jurisdiction is granted.

## C. SCS

Medline argues that this Court has general and specific jurisdiction over SCS, or that in

the alternative, this Court has personal jurisdiction over SCS under Rule 4(k)(2). For this Court

to have general jurisdiction over SCS, Medline must show that SCS has "continuous and

systematic general business contacts" with Illinois, such that it could be subject to suit in Illinois

regardless of the subject matter of the litigation. *Purdue Research Found.,* 338 F.3d at 787.

"These contacts must be so extensive to be tantamount to [SCS] being constructively present in

the state to such a degree that it would be fundamentally fair to require it to answer in an

[Illinois] court, regardless of the subject matter of the litigation." *Id.*

Haboush, SCS's president, attests that SCS does not offer any services in Illinois, has no

business dealings or contracts with any entity located in Illinois, and does not have a license to do

business in Illinois. (R. 34, SCS Mem. in Supp. of Mot. to Dismiss, Ex. A, 1st Haboush Decl. ¶

6.) Haboush also attests that no employee of SCS has ever entered into any transactions in

Illinois or solicited any business in Illinois on behalf of SCS. (*Id.* ¶ 7.) SCS receives incoming

telephone calls from customers of the entities for whom SCS provides customer service, but

11

"SCS employees never make any outbound phone calls in providing customer service except when administrative phone lines are used to call customers who request clarification" from SCS's managers, and these calls average three to five per week. (*Id.* ¶ 9.) These contacts clearly do not constitute "continuous and systematic general business contacts," so SCS is not subject to general jurisdiction in this Court.

With respect to the question of specific jurisdiction, SCS provided customer service for the Medline Savings program from July 2006 to May 2007. (*Id.* ¶ 13.) During that time, Haboush states that SCS's only interaction with customers of that program was its receipt of inbound customer service calls. (*Id.*) SCS never received any files for customers residing in Illinois, nor serviced any customers from Illinois relating to that program. (*Id.* ¶ 14.) SCS received calls from 17 different phone numbers located in Illinois to the toll free number it established for the Medline Savings program, most of which appear to have come from banks. (*Id.* ¶ 15.) Pursuant to its contract with Benashore, SCS forwarded the list of verified "Medline Savings" customers to Benashore's designated payment processors and customer fulfillment company. (R. 48, SCS Reply, Ex. A, 2nd Haboush Decl. ¶¶ 5-7.) Haboush states that SCS did not have communications with Wong or Abukhalid on a routine basis outside of receiving customer files from them. (*Id.* ¶ 9.)

Medline argues that pursuant to these activities, SCS "directed" the withdrawal of funds from Illinois banks and the shipment of fulfillment packages to "Medline Savings" consumers, and thus is subject to personal jurisdiction in Illinois under the "effects doctrine" and because it transacted business and committed tortious acts in Illinois. (R. 46, Pl.'s Resp. to SCS Mot. to Dismiss at 3.) SCS, however, had no control over where "Medline Savings" consumers banked,

12

and SCS cannot be said to have purposefully availed itself of the privilege of conducting activities in Illinois. *See Purdue*, 338 F.3d at 780. SCS could not have anticipated being haled into an Illinois court with respect to the claims at issue, and thus this Court cannot assert specific personal jurisdiction over SCS.

Nevertheless, Rule 4(k)(2) provides for personal jurisdiction if SCS is not subject to jurisdiction in any state's courts of general jurisdiction and exercising jurisdiction is consistent with the United States Constitution and laws. Fed. R. Civ. P. 4(k)(2). Rule 4(k)(2) applies to defendants "who do not reside in the United States, and have ample contacts with the nation as a whole, but whose contacts are so scattered among states that none of them would have jurisdiction." *ISI Int'l, Inc. v. Borden Ladner Gervais*, 256 F.3d 548, 551 (7th Cir. 2001). The first element of the Rule 4(k)(2) analysis requires the same "minimum contacts" due process analysis as is conducted under Rule 4(k)(1)(A), with the significant difference being that the relevant forum is the United States as a whole, not any individual state. *Id.*

SCS contends that Rule 4(k)(2) does not apply because it does not have ample contacts with the United States as a whole. The Court disagrees. SCS has done business with 16 United States companies in the past 4 years, including companies based in Georgia, New York, Utah, Kentucky, Nevada, California, Colorado, Texas, Florida, and Rhode Island. (R. 55, SCS Resp. to Court Order, Ex. B.) SCS receives telephone calls on a daily basis from individuals residing in the United States as part of its customer service operations. (R. 55, SCS Resp. to Court Order at 3.) SCS has "one or two" telephone lines capable of making outgoing calls used for "call-backs" to customers of a merchant or banks that have requested certain information. (R. 55, SCS Resp. to Court Order at 4.) SCS makes an average of 6 to 7 outbound calls per day to customers or

13

companies in the United States. (*Id.*) SCS provided customer service and verification services for many of these companies, similar to what it provided for the "Medline Savings" operation. Medline estimates that SCS serviced 5,000 United States customers for the "Medline Savings" program alone, and 1,000,000 United States customers total. (R. 59, Medline Sur-Reply at 2.) Further, Medline alleges that SCS derives a substantial economic benefit from its dealings with United States consumers and banks, including over $80,000 for the Medline Savings operation alone. (R. 46, Pl.'s Resp. to SCS Mot. to Dismiss, Ex., Solovay Aff. ¶ 11.)

In *ISI Int'l*, the Seventh Circuit held that a defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. *ISI Int'l*, 256 F.3d at 551. SCS, however, maintains that it cannot be sued anywhere in the United States. In this case, where "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible," the federal court is entitled to employ Rule 4(k)(2). *Id.* at 552. For the reasons explained above, SCS has "ample contacts with the nation as a whole" such that this Court's exercise of personal jurisdiction over SCS accords with the minimum contacts due process analysis in Federal Rule of Civil Procedure 4(k)(2). *ISI Int'l*, 256 F.3d at 551. Therefore, this Court has personal jurisdiction over SCS pursuant to Rule 4(k)(2).

## II.    Rule 12(b)(6) Failure to State a Claim

As for SCS's Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court accepts the well-pleaded allegations in the SAC as true, and draws all reasonable inferences in Medline's favor. *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 457 (7th Cir. 2007). "[I]t is not enough for a complaint to avoid foreclosing possible bases for relief; it must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief

14

above the speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th

Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1968 (2007)). SCS argues

that each count of Medline's SAC fails to state a claim upon which relief can be granted.

## A. Count I - Telemarketing and Consumer Fraud and Abuse Prevention Act

SCS argues that the Telemarketing Act does not provide a cause of action for Medline.

(R. 34, SCS Mem. in Supp. of Mot. to Dismiss at 13.) Section 6104, titled "Actions by private

persons," states:

> Any person adversely affected by any pattern or practice of telemarketing which
> violates any rule of the Commission under section 6102 of this title, or an
> authorized person acting on such person's behalf, may . . . bring a civil action . . .
> against a person who has engaged or is engaging in such pattern or practice of
> telemarketing if the amount in controversy exceeds the sum or value of $50,000 in
> actual damages for each person adversely affected by such telemarketing. . . .

15 U.S.C. § 6104(a). The Telemarketing Act does not provide a separate definition for "person."

SCS claims that Section 6104 provides a cause of action for the individual consumers who

received the allegedly fraudulent telephone calls and purchased the "Medline Savings" packages,

but not for Medline, an alleged victim of trademark violations.

There is a dearth of case law on this issue.[2] What case law exists, however, supports

Medline's interpretation that the Telemarketing Act does provide it with a cause of action. In

*800-JR Cigar, Inc. v. GoTo.Com*, 437 F. Supp. 2d 273, 296 (D. N.J. 2006), for example, the New

---

[2] SCS points to the Senate committee report on the Telemarketing Act, which appears to
limit persons who may bring actions under Section 6104(a) to "those who actually purchased
goods or services or are obligated to pay for goods or services, or financial institutions." S. Rep.
No. 103-80, 1993 WL 241282, at *12-13 (June 29, 1993). The final wording of the statute,
however, issued in August 1994, is much broader: "any person adversely affected by any pattern
or practice of telemarketing which violates any rule of the Commission under section 6102 of
this title."

15

Jersey District Court held that the plaintiff—who alleged it was harmed from unfair use of its marks—had standing to bring claims under the Telemarketing Act, because the Act broadly authorizes suits by "any person adversely affected" by violations of the Act. *Id.* (citing 15 U.S.C. § 6104(a).) The court dismissed the defendant's argument that it was the public, not the plaintiff, who was deceived and harmed by the defendant's actions, finding that the plaintiff "is most certainly aggrieved by practices (if proven) that take unfair advantage of its marks and divert customers away from its website." *Id.* Medline, like the plaintiff in *800-JR Cigar*, has alleged that SCS and the other defendants illegally used Medline's trademark, resulting in actual harm to Medline. The Court finds that Medline has standing to sue under the Telemarketing Act.

SCS argues, however, that Medline's alleged damages are speculative and conclusory, and therefore cannot sustain the Telemarketing Act claim. Medline alleges that defendants used the "Medline Savings" name to profit from the goodwill owned by Medline in its MEDLINE mark. (R. 31, SAC ¶¶ 47-48.) In addition, Medline claims that "numerous consumers have been confused into believing that the 'Medline Savings' telemarketing operation was affiliated with or endorsed by Medline. In fact, some consumers and law enforcement officials have contacted Medline, believing it to be operating the 'Medline Savings' telemarketing scheme." (*Id.* ¶ 49.) Accordingly, Medline alleges that it was "severely injured in its business and property," and that the injury is and continues to be "immediate and irreparable." (*Id.* ¶ 54.)

Nevertheless, SCS contends, without case law support, that damages to reputation and loss of goodwill cannot constitute "actual damages" as required by the Telemarketing Act. The Court disagrees. These damages are typical of the type that result from the trademark infringement alleged by Medline. *See, e.g., Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d

16

808, 813 (7th Cir. 2002). As this Court has found that Medline—an alleged victim of trademark infringement—may bring an action under the Telemarketing Act, it follows that the harm suffered by Medline as a result of the alleged infringement is sufficient to plead damages under the Telemarketing Act. Accordingly, SCS's motion to dismiss Count I is denied.

## B.     Count II - Direct Trademark Infringement

SCS next argues that Count II of the SAC, alleging direct trademark infringement by SCS under 15 U.S.C. §§ 1114 and 1117, is legally deficient because Medline cannot establish that SCS used Medline's trademark in commerce. The Lanham Act makes actionable a defendant's "use in commerce" of the plaintiff's mark "in connection with the sale, offering for sale, distribution or advertising of any goods or services." 15 U.S.C. § 1114(1). The word "commerce" in this context means all commerce which may lawfully be regulated by Congress. 15 U.S.C. § 1127. The phrase "use in commerce" means

> the bona fide use of a mark in the ordinary course of trade . . . For purposes of this chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

*Id.*

In the SAC, Medline alleges that SCS directed payment processors to deduct Medline Savings funds from bank accounts and directed fulfillment companies to ship "Medline Savings" packages to consumers after listening to verification recordings of the sales of "Medline Savings" between the consumers and the telemarketers. (R. 31, SAC ¶¶ 35, 38.) In addition, Medline

17

alleges that SCS provided additional customer service, such as receiving calls from consumers questioning the "Medline Savings" transactions and requesting refunds, as well as calling back certain consumers to discuss questions they had about a transaction. (*Id.* ¶¶ 42-43.) SCS phone operators would verify the source of the consumer calls as regarding "Medline Savings," and according to the SAC, would try to convince consumers not to revoke their consent to the transaction. (*Id.* ¶¶ 41, 43.) Medline alleges that SCS derived an economic benefit from these activities. (*Id.* ¶¶ 35, 37.) Further, Medline claims that these activities caused consumers to be confused as to the source of origin of Medline Savings goods and services, and irreparably harmed Medline because consumers and law enforcement officials believed Medline was the entity responsible for the deceptive and abusive telemarketing practices. (*Id.* ¶¶ 49, 56, 59.)

SCS argues that Medline failed to allege that SCS used the MEDLINE trademark in commerce, and that SCS's activities do not constitute "use in commerce" of the MEDLINE mark because SCS did not use the mark in connection with its own products or services. (R. 34, SCS Mem. in Supp. of Mot. to Dismiss at 9; R. 48, SCS Reply at 13.) First, Medline's detailed factual allegations as to how the MEDLINE mark was used in the "Medline Savings" calls and follow-up SCS customer service calls are sufficient to allege "use in commerce" under the Supreme Court's interpretation of federal pleading standards in *Bell Atlantic*, 127 S.Ct. at 1968. Second, SCS need not have used the trademark in connection with its own products or services to be liable for trademark infringement to Medline. This Court is aware of no case directly on point, where a plaintiff sued a customer service company for infringing its trademark through use of the mark in telephone conversations with consumers and in forwarding consumer information to payment processing and shipment fulfillment companies. However, other district courts have

18

construed the phrase "use in commerce" broadly enough to encompass a defendant who did not actually sell or promote any goods or services in connection with the mark. *See United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 92 (2d Cir. 1997) (holding that use of mark as a "source identifier" for defendant's political activities was use of the mark in connection with services and covered by the Lanham Act); *Council of Better Bus. Bureaus, Inc. v. Bailey & Assocs., Inc.*, 197 F. Supp. 2d 1197, 1212 (E.D. Mo. 2002) (holding that use of "BBB" mark as precursor and inducement for a sale or after sale to invoke customer confidence was use of mark in commerce in connection with services). The Court finds these cases persuasive. As Medline has alleged that SCS participated in the alleged trademark infringement not merely by carrying out its obligations under the customer service contract with Benashore, but by trying to convince consumers not to revoke their consent to the "Medline Savings" transactions, Medline has sufficiently alleged that SCS used the MEDLINE mark in commerce "in connection with the sale, offering for sale, distribution or advertising" of the allegedly infringing "Medline Savings" transactions." 15 U.S.C. § 1114. SCS's motion to dismiss Count II of the SAC is therefore denied.

## C.    Count III - Contributory Trademark Infringement

In Count III of the SAC, Medline alleges that SCS committed contributory trademark infringement in violation of 15 U.S.C. §§ 1114 and 1117. Contributory trademark infringement occurs when a manufacturer or distributor (1) intentionally induces another to infringe a trademark or (2) continues to supply a product to one whom it knows or has reason to know is engaging in trademark infringement. *Inwood Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 (1982). The Seventh Circuit has interpreted contributory infringement to apply not just to

products, but also to services. *See Doe v. GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992). While a supplier of goods or services has no affirmative duty to seek out and prevent trademark violations, it has a duty to understand what a reasonably prudent person would understand. *Hard Rock*, 955 F.2d at 1149. The defendant cannot fail to investigate possible infringement because it "was afraid of what the inquiry would yield." *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) (citing *Louis Vuitton v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989)).

Medline has properly pled that the "Medline Savings" transactions infringed its trademark and that SCS knew or had reason to know of the trademark infringement when it provided customer service for the "Medline Savings" transactions.[3] (R. 31, SAC ¶¶ 43-44.) Furthermore, Medline alleges in the SAC that SCS may have had an even more integral role in the alleged infringement by trying to convince "Medline Savings" consumers not to withhold their consent to the "Medline Savings" transactions. (*Id.* ¶ 42.) Therefore, SCS's motion to dismiss Medline's contributory trademark infringement count is denied.

### D.    Counts IV through VI

Finally, SCS summarily argues that the last three Counts of the SAC fail for the same

---

[3] SCS argues that to state a claim for contributory trademark infringement, Medline must further show that SCS had direct control or monitoring of the instrumentality used by Wong to infringe on Medline's mark. In support of this argument, SCS cites to *SB Designs v. Reebok Int'l Ltd*, 338 F. Supp. 2d 904, 913 (N.D. Ill. 2004), which stated, without explanation, that the Seventh Circuit has adopted the Ninth Circuit's requirement that the plaintiff must plead that the defendant directly controlled and monitored the instrumentality of infringement used by the direct infringer. *Id.* (citing *Lockheed Martin Corp. v. Network Sol'ns, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)). This Court has not found any support for the proposition that the Seventh Circuit has adopted this standard and, accordingly, the Court relies on the Seventh Circuit case law as described above.

reasons that SCS argued that the Lanham Act claims fail. (R. 34, SCS Mot. to Dismiss at 12.)

Thus, for the same reasons this Court denied SCS's motion to dismiss Medline's Lanham Act

claims, this Court denies SCS's motion to dismiss Counts IV through VI of Medline's SAC.

SCS additionally argues that Medline's claim in Count V for trademark dilution under the

Lanham Act fails because Medline does not allege"contributory dilution," and there is no

recognized claim for "contributory dilution." (*Id.* at 12.) The Court agrees with SCS that

Medline did not state a claim for contributory trademark dilution; however, Medline's direct

trademark dilution claim is sufficient for the same reason its direct trademark infringement claim

is sufficient: Medline has adequately alleged that SCS used Medline's trademark in commerce.

Therefore, Medline has adequately pled trademark dilution under the Lanham Act, and SCS's

motion to dismiss Counts IV through VI for failure to state a claim is denied.

## CONCLUSION

For the reasons discussed above, this Court does not have personal jurisdiction over the Wong Defendants, so the Wong Defendants' motion to dismiss is granted. (R. 41.) The Wong Defendants are dismissed without prejudice to being named as defendants in the District of New Hampshire. The Court has personal jurisdiction over SCS pursuant to Federal Rule of Civil Procedure 4(k)(2), and SCS's motion to dismiss under Rules 12(b)(2) and 12(b)(6) is denied. (R. 33.) The parties are directed to reevaluate their settlement positions in light of this opinion and to engage in renewed efforts to settle this case. A firm litigation schedule, including a trial date, will be set at the next status hearing on May 28, 2008, at 9:45 a.m. unless this lawsuit has been settled.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

Dated: May 5, 2008

22